UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 4:07-cr-0007-5-DFH-MGN |
| | ) | |
| ANIBAL PINEDA-AREOLA, | ) | |
| | ) | |
| Defendant. | ) | |

ENTRY ON DEFENDANT'S MOTION TO SUPPRESS

A grand jury indicted defendant Anibal Pineda-Areola and others on charges
of conspiring to traffic in methamphetamine, cocaine, and marijuana in southern
Indiana and Kentucky.   Defendant Pineda has moved to suppress evidence
obtained as a result of his arrest on June 5, 2007 in Kentucky.  Pineda contends
that the law enforcement officers did not have probable cause to arrest him and
to seize two cellular telephones that were in his possession.  The court held an
evidentiary hearing on December 17, 2007 with testimony from Special Agent
Arnold Fitzgerald, Task Force Officer Mark Slaughter, and defendant Anibal
Pineda.  The parties have submitted additional post-hearing briefs, which have
included documents (Attachments A, B, and C to defendant's post-hearing brief)
that are also deemed part of the evidentiary record.  Pursuant to Rule 12(d) of the
Federal Rules of Criminal Procedure, the court now states its findings of fact and
conclusions of law.

*Findings of Fact*

Defendant Pineda was arrested in Kentucky on June 5, 2007 after being detained and questioned at the scene of a meeting that federal agents believed was a delivery of a wholesale quantity of cocaine.  No drugs were found at the scene, and Pineda was not arrested on drug charges at that time.  He was arrested instead for being in the United States illegally.

In May 2007, federal drug enforcement agents were investigating suspected drug trafficking in Louisville, Kentucky and southern Indiana.  The agents had carried out several controlled purchases of drugs from co-defendant Juan Diaz-Gaudarama (also known as "Jorge") and from one or more street-level dealers who obtained their supplies from Diaz.  The agents were interested in pursuing the source(s) of supply for Juan Diaz.  The agents obtained a court order authorizing interception of telephone calls to and from a cellular telephone that he had been using.  Interception began approximately May 20 or May 21, 2007.

During the interceptions, the agents heard telephone calls between Juan Diaz and a man identified as "Japo" (whose nickname was also sometimes noted as "Zapo" or "Sapo").  On May 24, 2007, Juan Diaz arranged to sell one kilogram of cocaine through Jose Velasco, who was also known as "the Texan."  Diaz

arranged for Samuel Solis to deliver the cocaine to "the Texan."[1]  These calls were those summarized as numbers 320, 321, and 325 in Government Exhibit 6.[2]

Later in the evening of May 24th, Diaz called 561-876-0117 and spoke to "Japo."  He told Japo that he was going to send Solis (also known as "Texas," as distinct from the customer known as "the Texan") to deliver "the sample" to "the Texan."  Gov. Ex. 6 (Call No. 399).  The substance of the call can fairly be interpreted as Diaz keeping "Japo" informed about the transaction and seeking his approval for it.[3]

On June 4, 2007, the agents intercepted a call from "Japo" to Diaz using the same phone number.  Gov. Ex. 6 (Call No. 2492).  The two discussed a delivery

---

[1]Solis and Juan Diaz-Gaudarama are also defendants in this case but have played no role in Pineda's motion to suppress.  The court's factual findings in this entry are without prejudice to reconsideration of factual issues as they may affect other defendants.

[2]The "line sheets" in Government Exhibit 6 were not prepared instantly. They contain some information added after the June 5th arrest of Pineda (such as information identifying "Japo" as Pineda).  However, the evidence from the agents indicated that the substance of the conversations was conveyed quickly to the agents in the field.  Accordingly, Government Exhibit 6 must be used with caution to understand the information the agents on the scene knew at the relevant time, when they detained and later arrested Pineda on June 5, 2007.

[3]As of May 24, 2007, the agents believed that the person using the 561-876-0117 number was Gaspar Villa.  See Def. Att. A at 2, ¶ 4.  Only later, after the arrest of Pineda on June 5th with the cellular telephone that rang when the agents dialed the number, did the agents conclude that Pineda was the person using that telephone.  See also Def. Att. C (report dated June 25, 2007 stating that earlier references linking that telephone number to Villa were incorrect and that all future reports should link that number to Pineda).

from Japo to Diaz.  The two appeared to be using a fairly simple code in which they talked about Japo delivering girls, oysters, coconuts, and some fish.  Japo said that he was going to drive to make the delivery.

The next day, on June 5, 2007, the agents intercepted a call from Japo to Diaz, again at 11:42 a.m. using the same telephones.  Gov. Ex. 6 (Call No. 2594).  Part of the call apparently dealt with a vehicle transaction, but at the end, Diaz told "Japo" that "Texas" (Solis) would be going to meet "Japo," but Diaz then said that someone named "Chili" would be going to meet "Japo."

At 1:28 p.m., "Japo" called Diaz again using the same cellular telephones.  Gov. Ex. 6 (Call No. 2622).  They talked about finding a meeting place as "Japo" was driving into Kentucky and the person acting for Diaz was driving south from Louisville to meet him.  Diaz asked "Japo" (listed as "Sapo") if he was just going to give him "the box."  "Japo" answered that he had a "little girl."

Solis was under surveillance by federal agents as he drove toward the expected meeting with "Japo."  The agents did not know the identity or have a description of "Japo."  Nevertheless, they reasonably believed that "Japo" was supplying Diaz with drugs and would be delivering a quantity of drugs, probably cocaine, to Solis that afternoon.

Solis eventually stopped in a McDonald's parking lot in Munfordville, Kentucky. Agents saw a dark-colored Ford F-150 pick-up truck approach and park next to Solis' car. They saw two people get out of the front seat of the truck: Pineda and Gaspar Villa, who had been driving. They approached Solis and talked briefly. Then one of the three men transferred a blue cooler from the truck to Solis' car. Two other people, an older man and a woman, were passengers in the back seat of the truck and stayed there.[4]

After the cooler was moved from the truck to Solis' car, the agents approached and detained the persons present for questioning. Pineda gave his name to the agents, as did others who were questioned. The agents checked with the Bureau of Immigration and Customs Enforcement and received word that Pineda and others were in the United States illegally and should be detained and taken to Louisville for questioning. (One or two of the men were U.S. citizens and were later released.)

The agents also brought a drug-detection dog to the location. The dog gave a positive signal for the presence of drugs, but none were found in a later search. The cooler did not have any cocaine or other contraband in it. Roughly 35 to 40 minutes after the start of the encounter, and before Pineda was transported to

_____

[4]The Drug Enforcement Administration's report on the incident reported that three men got out of the truck – Villa, Pineda, and Salustre Mujica-Camacho. Def. Att. B at 3, ¶ 12. This discrepancy between the officer's memory and the report seems minor and immaterial for present purposes.

Louisville in custody, Officer Slaughter searched and found two cellular telephones on Pineda's person.  Officer Slaughter used another cellular telephone to dial 561-876-0117, the telephone number that the agents knew had been used in the calls with "Japo."  One of the cellular telephones taken from Pineda vibrated in response to that call.  That cellular telephone was not registered in Pineda's name, but he admitted in his testimony that he had used the telephone on June 4th and 5th.  The telephone was seized as evidence in the drug investigation.  Def. Att. B at 3, ¶13(a).

Defendant Pineda testified that he had been arrested by immigration authorities in Florida and released on bail on March 6, 2007.  He claimed that he was given a new court date and was subject to no other restrictions on his conduct or travel.[5]

One disputed factual issue is precisely when agents searched Pineda and found  the cellular telephones.  Task Force Officer Slaughter testified that he had searched Pineda without finding the cellular telephones and later searched him

---

[5]At the hearing, the court expressed some skepticism about Pineda's claim that the only condition for his release was to appear when ordered, without restrictions on travel, but there is no contrary evidence.  Pineda's counsel noted in his post-hearing brief that he had verified that normal conditions of release in a removal or deportation proceeding do not restrict travel.  Def. Br. at 7 n.1.  From the court's perspective (outside BICE and the Department of Homeland Security), the absence of such restrictions seems odd.  Perhaps there are reasons for it that the court does not perceive.  For present purposes, the court accepts Pineda's testimony that his bond did not restrict his travel, but the fact remains that his presence in the United States had been and still was illegal on June 5, 2007.

again before transporting him to Louisville, at which point he found the cellular telephones.  The DEA Form 6 reported that all six occupants of the two vehicles were searched and that two cellular telephones were seized from Pineda.  Def. Att. B at 3, ¶¶ 12-13(a).  Pineda testified, but the court does not recall that he was asked exactly when in the encounter the cellular telephones were found.

The court makes no finding as to exactly when the agents found the cellular telephone with the number 516-876-0117, other than to find that the agents found it before they transported Pineda in custody to Louisville.

*Conclusions of Law*

When the agents observed the transfer of the cooler from the pick-up truck to the Solis car, they had reasonable suspicions that they were observing an illegal drug delivery.  Their suspicions were based upon the totality of circumstances, including the earlier controlled drug purchases from Diaz and his associates and the many telephone interceptions of calls using codes and arranging for sales and deliveries.  The agents reasonably interpreted the telephone calls between Diaz and "Japo" leading up to the June 5th rendezvous as planning a delivery of drugs from "Japo" to Solis, who was making the pick-up on behalf of Diaz.

All of that information was sufficient to authorize an investigative stop pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968).  Accord, *United States v. Sokolow*,

490 U.S. 1, 7 (1989). Police are entitled to ask for identification in a *Terry* stop. *E.g.*, *United States v. Jackson*, 377 F.3d 715, 717 (7th Cir. 2004), citing *Hiibel v. Sixth Judicial District Court*, 542 U.S. 177, 185-86 (2004). Pineda provided identification. His identification led the agents to contact the Bureau of Immigration and Customs Enforcement. The ICE agent advised the agents on the scene that Pineda was in the country illegally and should be taken into custody for further investigation.

The precise terms of Pineda's release from the immigration court in Florida are not material to the court's decision. The uncontroverted evidence shows: (a) that Pineda was in the United States illegally, and (b) that ICE advised the agents on the scene that Pineda was in the United States illegally and should be taken into custody. Whether that advice to take him into custody was right or wrong, it gave the agents on the scene probable cause to arrest Pineda. See *Smith v. City of Chicago*, 242 F.3d 737, 742-43 (7th Cir. 2001) (finding that officers had probable cause to arrest driver suspect of committing traffic offense when dispatcher misinformed officers that the driver had thirteen aliases and the driver could not produce proof of insurance). With that probable cause to arrest Pineda, the officers were entitled to search him before transporting him. *Michigan v. DeFillippo*, 443 U.S. 31, 35 (1979).

Taking Officer Slaughter's recollection as accurate, that he found the cellular telephone when searching Pineda just before transporting him to

Louisville, the search was reasonable and permissible as a search incident to a valid arrest.

On the other hand, the DEA Form 6 indicates that the agents carried out a search of all six occupants of the vehicles. Def. Att. B at 3, ¶ 13. If the report was written in chronological sequence, the sequence implies that the agents searched Pineda and the others before the agents learned that they had probable cause to arrest Pineda on immigration charges. See Def. Att. B at 4, ¶ 14. One reasonable interpretation of the report is that the search of Pineda occurred before the agents contacted ICE and were told they should arrest him. If that is what happened, then the full search of Pineda would appear to have gone beyond a protective pat-down that might have been reasonable as part of an investigative *Terry* stop. Cf. *Terry v. Ohio*, 392 U.S. at 23-24 (holding that officer had sufficient basis to frisk for weapons a subject suspected of planning a robbery); *United States v. Barnett*, 505 F.3d 637, 640 (7th Cir. 2007) (holding that officers conducting *Terry* stop could frisk for weapons a possible suspect in armed robbery).

Even if the search of Pineda's person was unconstitutionally premature, however, the exclusionary rule would not apply to the telephone itself because of the inevitable discovery exception to that rule. See generally *Murray v. United States*, 487 U.S. 533 (1988); *United States v. Blackwell*, 416 F.3d 631, 633 (7th Cir. 2005). Pineda was going to be arrested for being in the United States illegally. It

was inevitable that he would be searched so that the telephone would have been discovered.  See *United States v. Rhind*, 289 F.3d 690, 694 (11th Cir. 2002) (assuming that search of suspect's bag went beyond what was allowed by *Terry*, the contents of bag would inevitably have been discovered in routine inventory search following proper arrest that was not based on the search of the bag).  Even if the agents found the telephone before they knew they had probable cause to arrest Pineda, the telephone added nothing to the probable cause they eventually had to arrest Pineda for being in the United States illegally.

After the agents discovered the cellular telephones, Officer Slaughter used another telephone to dial 516-876-0117.  He heard and saw one of the telephones seized from Pineda ring or vibrate in response.  Dialing the telephone number was not a search within the meaning of the Fourth Amendment and did not invade any protected privacy interest.  See *Commonwealth v. Terry*, 2002 WL 1163449, at *1-2 (Va. App. 2002) (unpublished opinion) (reversing suppression order and holding that police officer's call to cellular telephone number was not a search; distinctive ring of telephone in the house where officer was lawfully present told him that stolen telephone was present). There is no evidence here that the agents conducted any further search of the contents of the telephone's memory, such as a record of incoming or outgoing calls, text messages, etc.  Thus there is no issue here as to whether a warrant would have been needed for such a further search. Cf. *United States v. James*, 353 F.3d 606, 617 (8th Cir. 2003) (holding that inevitable discovery exception did not apply to seizure of computer discs and

search of their contents, so that fruits of warrantless search should have been suppressed); *United States v. O'Razvi*, 1998 WL 405048, at *6-7 (S.D.N.Y. July 17, 1998) (noting government's concession that warrant was needed to search contents of computer discs seized in otherwise lawful arrest and search), *aff'd mem.*, 173 F.3d 847 (2d Cir. 1999); *Smith v. State*, 713 N.E.2d 338, 343-45 (Ind. App. 1999) (ordering suppression of contents of memory of cellular telephone searched without warrant).

Pineda argues that the search and seizure of all six persons at the Munfordville McDonald's rendezvous violated the Fourth Amendment because no crime had been committed, citing *United States v. Jenkins*, 876 F.2d 1085 (2d Cir. 1989). In *Jenkins*, agents were investigating a public official suspected of money laundering, and the official indicated he would be willing to carry large amounts of cash out of the United States without filing the required currency reports. An undercover agent met with the suspect and gave him $150,000 in sting money. The suspect said he would take the cash out of the United States that evening. Agents arrested the suspect as he left the meeting, and they searched the suitcase containing the money. They also seized additional incriminating documents from the suitcase. The district court suppressed the documents as evidence. In the course of remanding for further fact-finding, the Second Circuit held that the agents did not have probable cause to arrest the suspect because he had not yet committed a crime. When he was arrested, he still had many hours in which to file the required currency reports. 876 F.2d at 1089.

*Jenkins* is relevant to the extent that the government agents in this case did not have probable cause on June 5, 2007 to arrest Pineda for drug trafficking. *Jenkins* does not help Pineda, however, because the agents had probable cause to arrest him for being in the United States unlawfully.  And whether the telephone was discovered in a search incident to that lawful arrest or was instead discovered earlier in an unlawful search but would have been discovered inevitably in a search incident to the lawful arrest, the telephone should not be suppressed as evidence.

At the time of the initial detention, the agents did not know which of the four people in the truck was most likely "Japo" or was otherwise involved in the suspected delivery.  Pineda argues that without individualized suspicion, the agents were not authorized to detain any one of the four individuals in the truck, citing *Ybarra v. Illinois*, 444 U.S. 85 (1979).  The court disagrees.  The officers had a reasonable suspicion that the truck would be used to deliver cocaine at the Munfordville McDonald's.  Although they did not know which person was "Japo," the agents could conduct a *Terry* investigative stop to seek each person's identity and additional information.  See *United States v. Rhind*, 289 F.3d at 694 (finding that where officers knew that one of three suspects was wanted on 15 felony warrants but officers did not know which one of the three, officers had reasonable suspicion that bag carried by one suspect might contain a weapon or contraband). In this case, in the course of that lawful investigative stop, the agents learned that Pineda was in the United States illegally and should be arrested.

-12-

The situation in *Ybarra v. Illinois* is not comparable.  There the Supreme Court held that the search of all customers at a bar being searched pursuant to a search warrant was not reasonable under the Fourth Amendment.  The police had a search warrant based on probable cause to believe that the bartender would have heroin for sale on the premises, but the bar was a public commercial establishment.  The police had no basis for suspecting Mr. Ybarra or any other customer in particular, so the frisk and more thorough search were unconstitutional.  444 U.S. at 90-94.  In this case, by contrast, the agents had objective and specific grounds for believing that the rendezvous at the Munfordville McDonald's would be a delivery of a large quantity of cocaine.  They could not be sure about the specific roles of the different persons present, but the agents were authorized to detain all of them briefly to investigate the situation.

For the foregoing reasons, the court denies defendant Pineda's motion to suppress evidence.

So ordered.

Date: January 10, 2008

_____
DAVID F. HAMILTON, CHIEF JUDGE
United States District Court
Southern District of Indiana

Copies to:

Matthew P. Brookman
U.S. ATTORNEY'S OFFICE
101 N.W. Martin Luther King Jr. Blvd.

Suite 250
Evansville, IN 47708

David S. Mejia
DAVID MEJIA LAW OFFICE
455 South Fourth Street
Suite 370
Louisville, KY 40202